IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NUMBER 21-332 |
| | : | |
| STEPHEN CHASE RANDOLPH | : | |

MOTION TO REVOKE DETENTION ORDER
AND FOR PRETRIAL RELEASE

Defendant Stephen Chase Randolph, by and through his undersigned attorney, moves the Court, pursuant to 18 U.S.C. §§ 3142(e) and 3145(b), to revoke the Magistrate Judge's order of detention and issue an order authorizing pretrial release with location monitoring or other conditions deemed appropriate by the Court. The rule of equity weighs in favor of granting Mr. Randolph's pretrial release where the Magistrate Judge in the Eastern District of Virginia ordered the release of his similarly situated co-defendant on bail, and, in the U.S. District Court for the District of Columbia, the government did not seek co-defendant's Paul Russell Johnson's pretrial detention. Mr. Randolph is neither a flight risk, nor a risk of danger to his community. Monitoring, along with other conditions of release, reasonably will assure Mr. Randolph's future appearances before this Court and the safety of other persons and the community.

I. PROCEDURAL HISTORY

On April 16, 2021, the government filed a criminal complaint against Mr. Randolph, charging him with several offenses related to the breach of the Capitol on January 6, 2021. Mr. Randolph subsequently was arrested in Harrodsburg, Kentucky on April 20, 2021, and the government orally moved for pretrial detention on April 21, 2021. On April 23, 2021,

Magistrate Judge Matthew Stinnett held a Preliminary and Detention hearing in the Eastern District of Kentucky.[1] On April 30, 2021, Magistrate Judge Stinnett issued a detention order granting the government's oral motion for detention.[2]

An indictment was returned against Mr. Randolph on April 30, 2021.[3] Except for Count Four, co-defendants Mr. Randolph and Paul Russell Johnson are indicted on identical charges. On April 14, 2021, Mr. Johnson was arrested in the Eastern District of Virginia. On the government's motion, Magistrate Judge Elizabeth Hanes ordered Mr. Johnson temporarily detained. Mr. Johnson's detention hearing was held on April 19, 2021, and Magistrate Judge Hanes ordered defendant released on bond with electronic monitoring. On April 29, 2021, Mr. Johnson appeared for his detention hearing before Magistrate Judge G. Michael Harvey in the U.S. District Court for the District of Columbia; the government did not seek Mr. Johnson's detention and he was released on personal recognizance.

## II.  FACTUAL BACKGROUND

Stephen Chase Randolph is a 31-year old native Kentuckian. Aside from a brief one-year

---

[1] At the April 23, 2021 detention hearing, Jeannie Hood, Mr. Randolph's girlfriend, and Ms. Hood's parents Ollie and Wendy Hood testified as to Mr. Randolph's good character and affirmed that he could return to live with Ms. Hood upon release. At the close of the hearing, Magistrate Judge Stinnett took the government's motion for detention under advisement and remanded Mr. Randolph to custody.

[2] Magistrate Judge Stinnett found that Mr. Randolph was an "irremediable danger risk[,]" a finding primarily based on certain statements Mr. Randolph made to undercover FBI agents on April 13, 2021. Detention Order of 4/30/21, at 18. Notably, Magistrate Judge Stinson also found that: (1) Mr. Randolph was not a flight risk; (2) the government did not present any evidence that Mr. Randolph would obstruct justice if released and should not be detained on this basis; (3) Mr. Randolph's history and characteristics weighed in favor of release; and that the facts presented a "close case[.]" *Id*. at 5-6, 14, 18.

[3] The indictment charges Mr. Randolph with civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); assaulting, resisting, or impeding certain officers using a dangerous weapon, inflicting bodily injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b) (Count Three); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Count Four); entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) (Count Five); disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A) (Count Six); engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, resulting in significant bodily injury, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(1)(A), and (b)(1)(B) (Count Seven); disorderly conduct in a Capitol building, in violation of 40 U.S.C § 5104(e)(2)(D) (Count Eight); and act of physical violence in the Capitol grounds or building, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Nine).

stint in Colorado, Mr. Randolph has lived solely in Kentucky.  He was born in Somerset, Kentucky to Glenna Randolph and Thomas Thornton.  Mr. Randolph's parents never married, and his father never established a relationship with him.  At the age of six, his life was forever changed when his mother died in a house fire.  His mother was his sole caretaker and, absent a relationship with his paternal relatives, Mr. Randolph was sent to live with his maternal aunt.  This arrangement was unstable and abusive and after a few years of living in her home, his grandmother Judy Pendleton became his primary caregiver and he lived with her for the remainder of his formative years.  Ms. Pendleton died of liver cancer in 2020, and this loss impacted Mr. Randolph deeply.

Mr. Randolph has been in a long-term, committed relationship with Jeannie Hood for approximately seven years. They live together in Harrodsburg, Kentucky, and he has a close relationship with Ms. Hood's parents Ollie and Wendy Hood.  The Hood family testified on Mr. Randolph's behalf at his detention hearing, and all three family members "expressed their willingness to support Randolph during the pendency of this case." Detention Order at 6.  Specifically, Ms. Hood's parents "expressed true affection and loyalty to Randolph." *Id*.

Mr. Randolph graduated from Casey County High School in June 2009. After graduation, his primary employment has been as a Certified Nursing Assistant ("CNA").  Mr. Randolph is bonded with the Hood family through his relationship with Jeannie Hood, but also because Ms. Hood's grandmother Dorothy Hood lived with Mr. Randolph and Jeannie Hood.  Mr. Randolph served as Dorothy's caregiver for approximately seven years.  This arrangement continued until Dorothy passed away in April 2021 at the age of 102.  In addition to providing nursing assistance to Dorothy Hood, Mr. Randolph has worked at Marathon Gas since January 2021.

Mr. Randolph was never political or civically engaged prior to the 2016 Presidential election. The candidacy of Donald Trump engaged him, and for the first time in his life he voted in an election. Mr. Randolph travelled to Washington, D.C. for the "Stop the Steal" rally and to hear then-President Trump speak. He has no cellular phone of his own and limited presence on social media. He decided on his own to borrow his girlfriend's car and mobile phone and to drive to Washington, D.C. He has no passport, has never been out of the country, and had never visited Washington, D.C. prior to January 6th. He arrived alone in Washington, D.C. on the morning of January 6, 2021. He walked to the area of the Washington monument, listened to President Trump's son, Eric, speak  As Eric Trump's speech wound down, Mr. Randolph joined numerous others  walking to the Capitol. Mr. Randolph had no prior intent to enter the Capitol building or engage in violence, but the energy of the crowd that day is well-documented, and the mood shifted from one of purported patriotism to agitation. Mr. Randolph's alleged conduct that day was contrary to how he comported himself before and after January 6th.

Mr. Randolph has minimal criminal history, no history of substance abuse or mental health issues. He is an anomaly for his generation – he has no cellular phone and almost no presence on social media. He is not a member of a violent or extremist group. Rather he is a lone individual who was persuaded by the rhetoric of President Trump and the Republican party, and was led to believe that the 2020 election was stolen. Mr. Randolph believed voter fraud occurred and committed to actions that were otherwise outside of his character. He is not a threat to his community and should not be detained pending trial.[4] Indeed, his co-defendant

---

[4] Mr. Randolph's undersigned counsel was scheduled to speak with him on Friday, May 21, 2021, at 10 a.m. by video conference at his local detention facility to discuss the instant motion for pretrial release. Mr. Randolph was moved from the Woodford County Detention Center on May 20, 2021 and counsel was unable to speak with him. As such, Mr. Randolph respectfully requests the right to supplement this motion with additional information, as necessary, after he and counsel have been able to speak.

4

Paul Russell Johnson, who is charged with almost identical offenses, has been free on bond since April.

### III.   DISCUSSION

Mr. Randolph seeks revocation of the detention order issued by Magistrate Judge Stinnett.  "If a person is ordered detained by a magistrate judge, . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order."  18 U.S.C. § 3145(b); *see also United States v. Hassanshahi*, 989 F. Supp.2d 110, 113 (D.D.C. 2013) ("Authority to review the release order lies with the district judge.").  The district court judge reviews the magistrate judge's detention order *de novo*.  *Id.*; *see also Klein*, 2021 WL 1377128, at *3 ("Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review.").

Utilizing the "default rule favoring liberty," Mr. Randolph should be released pre-trial.  *United States v. Cua*, No. CR 21-107, 2012 WL 918255, at *8 (D.D.C. Mar. 10, 2021) (granting defendant's release to custody of parents in insurrection case involving, among other charges, assault with dangerous weapon).  Indeed, "'[o]ur system of criminal justice embraces a strong presumption against detention.'" *Hassanshahi*, 989 F. Supp.2d at 113 (quoting *United States v. Hanson*, 613 F.Supp.2d 85, 87 (D.D.C. 2009)).  "'In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'"  *Id.* (quoting *United States v. Salerno*, 481 U.S.739, 755 (1987)).  In light of these guiding principles, Mr. Randolph should be released pending trial because there is no serious risk that he will obstruct justice, nor is he a flight risk or danger to the community.  Therefore, the Bail Reform Act requires release in this case because "there are conditions of release that will reasonably assure [his] appearance and the safety of any other person and the community . . . ."  18 U.S.C. § 3142(f) and (g).

5

### A. Mr. Randolph Cannot Be Detained on Obstruction of Justice Grounds Because the Government Has Not Presented Any Evidence That There Is a Serious Risk That He Will Obstruct or Attempt to Obstruct Justice.

Mr. Randolph should not be detained on obstruction grounds because there is absolutely zero evidence that there is a serious risk that he is likely to commit obstruction offenses if released from detention. The Bail Reform Act requires the Court to hold a detention hearing upon motion of the government where the case involves "a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure or intimidate, or attempt to threaten or intimidate a prospective witness or juror." 18 U.S.C. § 3142(f)(2)(B). The government sought detention on obstruction grounds because Mr. Randolph "is charged with an obstruction of justice offense." Detention Order at 5. However, the government did not present any "evidence at the hearing that there is any risk – much less a 'serious risk' – that Randolph will obstruct justice or 'threaten, injure, or intimidate' a witness or juror during the pendency of this case." *Id*. The mere fact that Mr. Randolph has been charged with obstruction of an official proceeding cannot serve as the sole basis for detention on obstruction grounds. Indeed, "[t]here is not a *per se* rule that an obstruction of justice charge warrants detention." *United States v. Omar*, No. 3:10-CR-00260. 2011 WL 902487, at *15 (M.D. Tenn. Mar. 15, 2011) (citation omitted); *see also United States v. Demmler*, 523 F. Supp.2d 677, 683 (S.D. Ohio 2007) ("[T]he Court will not assume that just because [defendant] has been charged with . . . obstruction of justice, he is likely to commit these same offenses again during the course of these proceedings. Indulging in such an assumption would be tantamount to creating a *per se* rule of detention in cases involving . . . obstruction[.]"). Absent the obstruction charge against Mr. Randolph in the instant matter, there is no adequate reason to detain him on obstruction grounds.

### B. The Government Cannot Prove by a Preponderance of the Evidence That Mr. Randolph Poses a Serious Risk of Flight.

There is no serious risk that Mr. Randolph will flee if released on bail – even the government agrees with the defendant on this point. *See* Detention Order at 6 (noting the government "ultimately did concede that the 'weight of the evidence that he would flee is not strong'"). The government sought pretrial detention in this case on the grounds that this case "involves . . . a serious risk that [Mr. Randolph] will flee . . . ." *Id*. In support of this motion for detention, the government argued that Mr. Randolph is a flight risk because two of the charges against him carry severe sentences and weak ties to the Eastern District of Kentucky. Both of these arguments lack merit. "In evaluating the likelihood of flight, the potential penalty has merit, but . . . the stability of [defendant's] relationship to the community" is much more persuasive. *White v. United States*, 412 F.2d 145, 147 (D.C. Cir. 1968).

The preponderance of evidence in this case establishes that Mr. Randolph does not "pose[] a risk of flight or nonappearance[.]" Detention Order at 7 (holding government did not prove by preponderance of evidence that Mr. Randolph is a flight risk); *see also United States v. Xulam*, 84 F.3d 441, 442 (D.C. Cir. 1996) ("[W]hen the government seeks pretrial detention of an individual on the ground that he poses a risk of flight, the standard it must satisfy is a 'preponderance of evidence.'" (citation omitted)). Mr. Randolph has strong ties to Kentucky, the state he was born in and where he has lived almost exclusively for the entirety of his life. Detention Order at 6. He lives with his girlfriend, Jeannie Hood, and has been in a relationship with her for approximately seven years. *Id*. Ms. Hood's father, who is a lawyer and minister, testified at the detention hearing that, if released, Mr. Randolph would be welcomed back to live at the residence and that "he would pay Randolph to fix up the property." *Id*. Magistrate Judge Stinnett was persuaded by the testimony of Ms. Hood and her parents, and concluded that their

7

"genuine outpouring of support suggests Randolph would have little reason to flee." *Id*. Nor does Mr. Randolph have the financial resources to flee – at the time of the detention hearing, he had approximately $300 in savings, no cell phone or passport, and "no ties outside of the Commonwealth." *Id*. (citing Pretrial Services Report at 2-3). In light of Mr. Randolph's strong ties to the Eastern District of Kentucky, and lack of serious risk of flight, detention on the basis of likelihood to flee is not warranted.

### C. The Government Cannot Prove By Clear and Convincing Evidence That Mr. Randolph Presents an Identified and Articulable Threat to an Individual or the Community.

Outside of the unique set of circumstances that drew Mr. Randolph to Washington, D.C. on January 6th, he does not present any specific and identifiable threat to any individual or his community. "To justify detention . . . [based on] dangerousness, the government must prove by 'clear and convincing evidence' that 'no condition or combination of conditions will reasonably assure the safety of any other person in the community." *United States v. Munchel*, 991 F.3d 1273, 1279-80 (D.C. Cir. 2021) (citations omitted); *see also* 18 U.S.C. § 3142(f). In assessing whether Mr. Randolph must be detained on the basis of dangerousness, the Court considers the following factors: "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . .; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). On balance, weighing these factors against the backdrop of the notion that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception[,]" Mr. Randolph does not pose a "concrete, prospective threat to public safety." *Munchel*, 991 F.3d at 1279, 1280.

      *1. Nature and circumstances of the offense charged.*

In considering the nature and circumstances of the offense charged, the Court considers whether the offense charged is a crime of violence. 18 U.S.C. § 3142(g)(1). Count Three of the indictment charges Mr. Randolph with assaulting, resisting, or impeding certain officers using a dangerous weapon, inflicting bodily injury, in violation of 18 U.S.C. §§ 111(a)(1) and (b). The D.C. Circuit Court has yet to rule on the issue of whether § 111(b) categorically constitutes a crime of violence. *See United States v. Klein*, No. CR 21-236, 2021 WL 1377128, at *6 (D.D.C. Apr. 12, 2021) (noting the "D.C. Circuit has not yet weighed in" but also recognizing that "every circuit to address the issue" has concluded that § 111(b) constitutes a crime of violence).

Even if the Court ultimately deems § 111(b) to be a crime of violence, such a determination should not weigh against release in this case, particularly in light of the fact that co-defendant Paul Russell Johnson, who is charged under the same statute, has been released. Not only has he been released on bail, but the government did not even seek detention in his case in D. C. District Court. *See* Minute Entry for Johnson Detention Hr'g of 4/29/21 ("Government does not seek the Defendant's pretrial detention."). Mr. Johnson's release – and the release of other Capitol defendants charged under § 111(b) – demonstrates that there is no *per se* rule that individuals charged with a violation of § 111(b) must be detained. *See*, *e.g.*, *Klein*, 2021 WL 1377128, at *1, *2 (D.D.C. Apr. 12, 2021); *United States v. David Alan Blair*, Crim. No. 21-186 (D.D.C.); *United States v. Clayton Ray Mullins*, Crim. No. 21-035-4 (D.D.C.); *United States v. Robert Scott Palmer*, Crim. No. 21-328 ((D.D.C.); *United States v. Robert Sanford*, Crim. No. 21-086 (D.D.C.); *United States v. Tristan Chandler Stevens*, Crim. No. 21-040-2 (D.D.C.); *see also United States v. Chrestman*, -- F. Supp. 3d --, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) ("Nonetheless, not all of the rioters charged with offenses stemming from the January 6

attack will be held pending trial. Nor has this court uniformly granted the government's requests for pretrial detention.").

In addition to taking into account whether this case involves a crime of violence, there are other circumstances to consider. While not binding on this Court, Beryl Howell, Chief Judge for the U.S. District Court for the District of Columbia, has set forth six factors to consider that are relevant to the nature and circumstances of offenses committed on January 6, 2021: whether defendant (1) has been charged with felony or misdemeanor offenses (2) engaged in prior planning before arriving at the Capitol; (3) carried or used a dangerous weapon during the riot; (4) coordinated with other participants before, during, or after the riot; (5) assumed a formal or de facto leadership role in the assault by encouraging other rioters' misconduct; and (6) used words and movements that reflected the egregiousness of his conduct. *Chrestman*, 2021 WL 765662, at *7-*8. Arguably, only two of the six factors in this case weigh in favor of detention – (1) felony offense and (6) words and movements, but conditions of release are capable of mitigating any perceived risk triggered by these two factors.

Mr. Randolph has been charged with felony offenses. While felony offenses "are by definition more serious than misdemeanor offenses[,]" this designation should not carry great weight. Individuals charged with felonies routinely are released from pretrial custody and, in this case, there are conditions of release that will mitigate any concerns about risk of danger and assure Mr. Randolph's appearance.

Here, with respect to his words and movements, Mr. Randolph did not enter the Capitol building by force. Nor are there are allegations that Mr. Randolph used any words to rile up the crowd or that would evince intent to overthrow the Capitol. In contrast, his co-defendant who was released brought a megaphone to the Capitol, which he used while confronting U.S. Capitol

Police officers. Johnson Statement of Facts at 3, 5. Mr. Randolph and co-defendant Mr. Johnson both allegedly pulled and pushed the metal barricades into U.S. Capitol Police officers, thus, it goes against reason that this sole factor should weigh more heavily in favor of detention for one co-defendant, but not the other. While Mr. Randolph's movements arguably might cause concern for the Court, these concerns may be alleviated through the use of tailored release conditions.

The remaining four factors weigh in favor of release. Mr. Randolph did not engage in any prior planning prior to traveling to the Capitol. He did not "obtain[] weapons or tactical gear[,]" which suggests that he was "caught up in the frenzy of the crowd" and did not travel to the Capitol "with the intention of causing mayhem and disrupting the democratic process." *Id*. at *8; *see also* Detention Order at 9 (finding no evidence of prior planning). Nor did Mr. Randolph use or carry a dangerous weapon during the riot. Detention Order at 9 (finding no evidence Mr. Randolph used or carried a dangerous weapon during the riot). This determination does not turn on the issue of whether a metal barrier is a dangerous weapon; instead, the inquiry is whether an individual "brought a weapon with him to the Capitol or carried any items that evinced an 'expectation that the need to engage in violence against law enforcement or . . . the Legislative branch might arise.'" *Klein*, 2021 WL 1377128, at *8 (finding that stolen police riot shield is not a weapon and use of stolen riot shield did not weigh in favor of detention ) (quoting *Chrestman*, 2021 WL 765662, at *8)). On January 6th, Mr. Randolph was dressed in civilian clothing (jeans, jacket, gray knit cap), and did not bring or use any weapons, such as "a firearm, a large pipe, a wooden club, an axe handle, or other offensive-use implement[.]" *Chrestman*, 2021 WL 765662, at *8.

There is absolutely no evidence that Mr. Randolph coordinated with other participants before, during, or after the riot. He has virtually no presence on social media; he drove his girlfriend's car to the rally alone, driving during the night and arriving in Washington, D.C. on the morning of January 6th. Upon arrival, he did not meet up with anyone, but rather went alone to President Trump's rally. After leaving the rally, he walked to the Capitol by himself. There simply is no evidence that Mr. Randolph coordinated with others to overtake the Capitol. *See* Detention Order at 9 (no evidence Mr. Randolph coordinated with other participants); *see also Chrestman*, 2021 WL 765662, at *8 (contrasting coordination of Proud Boys, which included urging the other Proud Boys to "take" the Capitol).

Finally, Mr. Randolph did not assume any formal or de facto leadership role on January 6, 2021. Detention Mem. of 4/30/21 at 10 (finding Mr. Randolph assumed no de facto leadership role). Mr. Randolph was a lone actor – he traveled alone, he attended the rally alone, and he walked to the Capitol grounds alone. Moreover, the relevant video evidence does not show that Mr. Randolph actively encouraged others to advance or confront law enforcement. In fact, the video corroborates his argument that he acted alone. Therefore, this factor weighs in favor of release.

2. *Weight of the evidence against Mr. Randolph.*

Although there is ample video evidence in this case, "[e]ven overwhelming evidence of guilt" does not amount to "clear and convincing evidence that no conditions of release can reasonably assure the safety of the community." *United States v. Taylor*, 289 F. Supp.3d 55, 66 (D.D.C. 2018) (instructing court must "review the weight of the evidence against the defendant as an indicia of whether any conditions of pretrial release will reasonably assure the safety of the

12

community"). There are conditions of release to assure the safety of Mr. Johnson's community, and there are likewise conditions to assure the safety of Mr. Randolph's community.

       3.   *History and characteristics of Mr. Randolph.*

In considering the history and characteristics of Mr. Randolph, the Court must take into account "the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings . . . ." 18 U.S.C. § 3142(g)(3)(A). After a full detention hearing, Magistrate Judge Stinnett found that "this factor weighs in favor of release." Detention Order at 14. A similar finding should be made in the instant matter.

Mr. Randolph has been in a relationship with his girlfriend Jeannie Hood for seven years, and the couple lives together. Indeed, with the exception of a brief stint in Colorado, Mr. Randolph has lived his entire life in the state of Kentucky.

Mr. Randolph – who is licensed as a Certified Nursing Assistant – was the caregiver for Ms. Hood's grandmother Dorothy Hood, until she passed away in April 2021. Until her death, Dorothy Hood lived with both Mr. Randolph and Jeannie Hood. Mr. Randolph also was employed at Marathon Gas from January 2021 until his detention. Ms. Hood's father, Ollie Hood, testified at the detention hearing that if Mr. Randolph is released, he will be welcomed back to his family's property, and that he would pay Mr. Randolph to fix up the property. *See* Detention Order at 6. Such employment would be useful because Mr. Randolph has limited financial resources. *See id*.

Mr. Randolph does not have close ties with his biological family, but Ms. Hood's family is an integral part of his life and she and her parents have "expressed their willingness to support Randolph during the pendency of this case." *Id*.

Notably, Mr. Randolph does not have significant substance abuse issues (he admits to occasional cannabis use), no mental health conditions, and is in good physical health. *See id*. at 13. Nor does Mr. Randolph have a history of violence or membership in violent or extremist groups. *Id*. Mr. Randolph has one 10-year old misdemeanor conviction for resisting arrest, but this offense "is not probative of [his] entire history and characteristics, nor indicative of future behavior . . . ." *Id*. In addition, the mere fact that Mr. Randolph has been charged for his actions on January 6th, cannot serve to undermine his history and characteristics. Such an approach would amount to a *per se* rule that all actors involved on January 6th should be detained. The release of his co-defendant, among others, establishes that no such rule exists. *See id*. at 14 (declining to find Mr. Randolph's "history and characteristics lean towards detention based solely on his actions on January 6th). Accordingly, based on the history and characteristics outlined above, this factor weighs in favor of release.

      4. *Nature and seriousness posed by Mr. Randolph's release.*

The final factor to consider is the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(4). This factor was "determinative in the [Magistrate Court's] decision to detain Randolph" but, respectfully, the court's conclusion regarding this factor was wrong and contrary to the law. When analyzing the nature and seriousness posed by Mr. Randolph's release, the Court must consider whether the government has "proved by clear and convincing evidence that an arrestee *presents an identified and articulable threat* to an individual or the community . . . ." *Munchel*, 991 F.3d at 1280.

Indeed, the point of detention is to "disable the arrestee *from executing that threat*." *Id.* (quotation omitted). In this respect, the Magistrate Court failed to adequately articulate the specific threat posed by Mr. Randolph.

The Court also must consider the threat in context. *Id*. at 1283. Here, when viewed in context, the only threat arguably presented by Mr. Randolph is limited to the particular circumstances that transpired on January 6th. *See id*. Viewed within the context of January 6th, the evidence shows that Mr. Randolph was caught up in the frenzy of the rally and protest. His lack of prior planning and coordination with others supports this determination. He was swept up in the large crowd and behaved in a manner that was completely foreign to his actions before or after January 6th. At most, one could assume *arguendo* that Mr. Randolph might pose a danger to, say, attempt to stop an act of Congress in the future, but this danger would require the same set of unique circumstances that occurred on January 6. 2021 – rally, protest, Congressional tally of votes – to take place again at some point in the future. This is simply too speculative a basis to make a specific finding of danger to any person or the community.

The Magistrate Court acknowledges that if it considers the threat in context, there absolutely are conditions to "mitigate, if not eliminate, the *one very specific risk*" that Mr. Randolph would engage in conduct during another political rally. Detention Order at 14-15. But the court improperly rejected the contextual consideration of dangerousness, instead opting to generalize the threat to his theoretical capability of assaulting and injuring law enforcement. *See id*. This generalized threat is not based on the stale resisting arrest conviction from 2011, which the court rightly discounted as a factor in favor of detention, but rather on Mr. Randolph's anomalous acts on January 6th.

15

There is no clear and convincing evidence that Mr. Randolph poses a specific danger to law enforcement if released, and the court erred in expanding the context of its review of his dangerousness. When considering the danger posed by a person's release, it absolutely is appropriate to consider whether the individual will "engage in the *same kinds* of inherently dangerous and illegal activities" at issue in the particular case. *United States v. Wiggins*, -- F. Supp.3d --, 2020 WL 1868891, at *8 (D.D.C. Apr. 10, 2020) (holding defendant did not show by clear and convincing evidence that if he were released he would not engaged in the same kinds of dangerous activities) (emphasis added); *see also United States v. Lee*, 451 F. Supp.3d 1, 7-8 (D.D.C. 2020) (concluding the danger posed by the person's release is the "risk that he will continue to engage in the *same types* of unlawful and potentially dangerous conduct") (emphasis added)).

Here, there is no danger that Mr. Randolph will engage in the same type of conduct in which he engaged on January 6th. Considering his "resources and capabilities," *Munchel*, 991 F.3d at 1283, he has minimal financial resources and no social groups with which to foment antisocial behavior; federal agents did not locate any weapons in the search of his residence and girlfriend's vehicles; and he has not created any social media posts threatening continued political violence. *See Cua*, 2021 WL 918255, at *7-*8 (granting release despite defendant's violent social media postings). Simply put, absent a coordinated political rally for a unique purpose, Mr. Randolph poses no danger to his community.

To be sure, Mr. Randolph's statements to undercover law enforcement about enjoying the rally and seeing the downed officer are regrettable. But these statements should not outweigh every other factor in this case weighing in favor of release. *See United States v. Padilla*, Crim. No. 21-214, 2021 WL 1751054, at *8 (D.D.C. May 4, 2021) (finding defendant's post-January

16

6th bragging resulted in "mixed" history and characteristics that did not "point definitively in one direction or the other.").

Viewing the nature and seriousness of the danger in context, it is clear that he posed no danger to his community before or after January 6th. Moreover, any risk concerns can be mitigated through any number of conditions of release. If, however, the Court considers the risk of danger in this case to be a close call, the decision regarding release should be "guided by the default rule favoring liberty." *Cua*, 2021 WL 918255, at *8.

## IV.     CONCLUSION

For the foregoing reasons, defendant Stephen Randolph Chase, respectfully requests the Court grant the instant motion and revoke the Magistrate Court's order of detention and issue an order for pretrial release.

Respectfully submitted,

*/s/ Angela Halim*
ANGELA HALIM
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I, Angela Halim, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I caused a copy of the Defendant's Motion to Revoke Detention Order and for Pretrial Release to be filed and served electronically through the District of Columbia District Clerk's Office Electronic Case Filing upon Robert Craig Juman, Assistant United States Attorney, United States Attorney's Office, 555 4th St., NW, Washington, DC 20530.

                                                   */s/ Angela Halim*
                                                   ANGELA HALIM
                                                   Assistant Federal Defender

DATE: May 21, 2021